# EXHIBIT B

Case 1:10-cv-08452-WHP   Document 4-3   Filed 11/11/10   Page 1 of 19

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

B E T W E E N

| | |
|---|---|
| Marklink Shipping Co Ltd | Owners (Claimants) |
| and | |
| Bright Shipping Company Limited and/also known as Bright Ocean Company Limited | Charterers (Respondents) |

m.v. "ATLANTIC PROJECT"

Charterparty dated 12th February 2009

FIRST/FINAL ARBITRATION AWARD

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

B E T W E E N

| | |
|---|---|
| Marklink Shipping Co Ltd | Owners (Claimants) |
| and | |
| Bright Shipping Company Limited and/also known as Bright Ocean Company Limited | Charterers (Respondents) |

m.v. "ATLANTIC PROJECT"

Charterparty dated 12th February 2009

FIRST/FINAL ARBITRATION AWARD

**WHEREAS:**

1.  By a charterparty on the New York Produce Exchange 1946 form incorporating additional terms as agreed between the parties on 12th February 2009 ("the Charterparty"), the Claimants ("the Owners") chartered the m.v. "ATLANTIC PROJECT" ("the vessel") to the Respondents ("the Charterers") for 11 to 13 months period time charter.

2. Clauses 17 and 95 of the Charterparty provided for arbitration in London in accordance with English law as follows:

> *"17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three Persons at London one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of Court. The Arbitrators shall be shipping men conversant with shipping matters and affairs. All arbitrators to be members of the LMAA."*

> *"Clause 95.*
> *Bimco Standard Law & Arbitration Clause 1998 – English Law, London Arbitration to be applied."*

The BIMCO standard law and arbitration clause 1998 provides as follows:

> *"LONDON ARBITRATION*
> *The Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.*

> *The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.*

> *The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and give notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days give specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.*
>
> *Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.*
>
> *In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMMA Small Claims Procedure current at the time when the arbitration proceedings are commenced."*

Furthermore, paragraph 6 (a) and (b) of the London Maritime Arbitrators Association terms 2006 provide as follows:

> *"In the absence of any agreement to the contrary the parties to all arbitral proceedings to which these Terms apply agree:*
> *(a) that the law applicable to their arbitration agreement in English law; and*

    *(b) that the seat of the arbitration is in England."*

3. Following a dispute between the parties, the Owners appointed me, the undersigned Alan Oakley of Hoy's Farm, Upwick, Ware, Hertfordshire to act as arbitrator and called upon the Charterers to appoint an arbitrator. No response was received from the Charterers within 14 days as required under clause 95 of the Charterparty and the Owners therefore appointed me as sole arbitrator in the reference. I am a member of the London Maritime Arbitrators Association ("the LMAA") as required by the arbitration clause. I am also a "shipping man", having been a member of the Baltic Exchange in the City of London for the past forty-two years. I am also a Fellow of the Institute of Chartered Shipbrokers and a Fellow of the Chartered Institute of Arbitrators.

4. On 1st July 2010, the Owners served claim submissions and claimed the overall sum of US$938,057.26, later amended to US$1,194,295.59, together with interest and costs.

5. On 2nd July, I ordered the Charterers to serve defence submissions (and counterclaim submissions, if any) on or before 31st July 2010 in accordance with the guidelines of the LMAA terms. However, the Charterers failed to comply with the order or communicate with me. Therefore, on 5th August 2010, I made a final and peremptory order that the Charterers had to serve defence submissions on or before 16th August. The terms of my order made it clear to the Charterers that if they failed to comply with the order, I would proceed to my award without further reference to them. Despite this warning, the Charterers failed to serve defence submissions or communicate with me.

6

6. The Owners were represented by the firm of C Solutions Limited of London. The Charterers were not represented. However, I am satisfied that all interlocutory correspondence and orders, together with copies of the Claimants claim submissions were served on the Charterers at their Registered Address.

7. Neither party requested an oral hearing.

8. The "ATLANTIC PROJECT" is a 17,850 mt deadweight multi-purpose vessel, built in 1988. On 12th February 2008, the Owners chartered the vessel to the Charterers for 11 to 13 months period time charter "*+/- 20 days in the Charterers option*". However, the Owners' evidence was that on 10th October 2010, they withdrew the vessel from the Charterers' service following their renunciatory breach of the Charterparty.

9. The following issues arose in this dispute:

   i) the Charterers' alleged renunciatory breach of the Charterparty;
   ii) the final balance of account;
   iii) damages for early redelivery; and
   iv) damages for detention.

10. Despite being given every opportunity to participate in these proceedings, the Charterers chose not to do so. I have therefore simply had to assume that the Charterers disputed the allegations made against them and that they challenged the accuracy of the Owners' evidence. It was therefore appropriate that I should scrutinise the Owners' claims with particular care and I did so.

(I) Renunciatory breach:

11. The Owners' evidence was that the vessel was delivered to the Charterers at 21:30 on 6th March 2009 at Singapore. Therefore, the earliest date that the Charterers were entitled to redeliver the vessel was on or about 16th January 2010. However, on 18th September 2009, the Charterers informed the Owners that they were unable to fulfil their obligations under the Charterparty, after which they failed to pay the 13th 14th and 14th instalments of hire.

12. At the time of the renunciatory breach, the vessel was sub-chartered to the LG International Corporation and was performing a voyage from Trimcomalee to South Korea. Therefore, the Owners came to an arrangement with the sub-charterers whereby the cargo was delivered/discharged in exchange for payment of US$169,224.48. The Owners finally accepted the Charterers' renunciatory breach on at 01:01 on 19th October 2009 at Inchon.

13. The Owners referred to the following email received from the Charterers on 18th September 2009:

> "in spite we, bright ocean co.,ltd. seoul, korea, as period time charterer and owners for present performing voyage, are having a duty to fulfil obligations against counter parties, we are not capable of performing same.
> we would like to express our sincere apology.
> in order to mitigate a potential losses of concerned parties, please4 establish a communication channel between head owners and voyage charterers ...
> once again, we are very sorry.
> b.Rgds / bright Ocean Co.,Ltd."

14. Renunciation of a contract occurs when one party by words or conduct evinces an intention not to perform, or expressly declares that he is not able to perform, his obligations under the contract in some essential respect. In cases of anticipatory breach by renunciation of the contract, the cause of action (such as the charterers' failure to pay future hire) is not the future breach, it is the renunciation itself. When establishing whether or not there has been a renunciation of a contract, there is no distinction between the tests for what is an anticipatory breach and what is a breach after the time for performance has arrived. It follows that where the conduct of the defaulting party is such as to lead a reasonable person to the conclusion that he does not intend to fulfil his obligation under the contract when the time for performance arrives, the innocent party may treat this as a renunciation of the contract and sue for damages forthwith. Furthermore, the law is similar where a party renounces a contract in the course of its performance, as for instance, where a charterer states that he will no longer comply with his obligations to pay hire. Therefore, given the their email of 18th September 2009, I accept that the Charterers did renunciate the Charterparty on that date. The Owners are therefore entitled to proven damages from 18th September 2008, albeit that they only accepted the renunciation on or about 9th or 10th October 2009, when they effectively withdrew the vessel from the Charterers' service. That, in my view, was a prudent commercial decision given that they had the LG International Corporation cargo on board the vessel, which still had to be discharged at Inchon at the time of the Charterers' original notice.

(II) The final balance of account:

15. The Owners claimed the sum of US$437,795.59 by way of the final balance of account at 01:01 on 10th October 2009.

16. The Owners' calculation made provision for hire at the Charterparty rate, less commissions and C/V/E costs, for the period 21:30 on 6th March 2009 to 01:01 on 10th October 2009. It also made provision for both delivery and redelivery bunkers at the Charterparty prices, as well as various miscellaneous expenses such as extra war risk insurance premiums, crew war bonuses and hold cleaning. It also included such costs as the Charterers were liable for, including various port expenses and unpaid bunker costs, all of which were supported by copies of invoices.

17. Having considered the evidence available to me, including the fact that the Charterers have not disputed the Owners' final statement of account, I am satisfied that the Charterers owe the Owners the sum of US$437,795.59 as claimed.

(III) Damage for early redelivery:

18. The Owners claimed damages for early redelivery in the sum of US$120,500, calculated as follows:

    - 10th October 2009 to 16th January 2010 = 99 days

    - 10th to 28th October = 18 days – vessel
      unemployed – Owners claimed damages
      of 18 days x US$6,000 per day                           US$108,000
    - 28th October 2009 to 22nd December 2009
      = 55.01389 days - vessel fixed to Seaway

  Korea Ltd at US$6,200 – Owners claimed no damages/loss

- 22nd December 2009 to 16th January 2010 = 25 days – vessel fixed to Puyvast Chartering at US$5,500 daily until 28th January 2010 – Owners claimed damages of US$6,000 less US$5,500 = US$500 x 25 days     <u>US$ 12,500</u>
- Total     US$120,500

19. Given the Charterers' breach, the Owners are entitled to proven damages. Therefore, although the Charterers did not challenge the Owners' evidence of how they subsequently employed the vessel for the balance of the charter period, it is helpful if I consider the rules on mitigation before allowing their claim under this head.

20. The rules of mitigation are as follows - see paragraph 26-092 of Chitty on Contracts:

> "MITIGATION: There are three rules often referred to under the comprehensive heading of mitigation. They will be considered in turn. First, the claimant cannot recover damages for any part of his loss consequent upon the defendant's breach of contract which the claimant could have avoided by taking reasonable steps. Secondly, if the claimant in fact avoids or mitigates his loss consequent upon the defendant's breach, he cannot recover for such avoided loss, even though the steps he took were more than could be reasonably required of him under the first rule. Thirdly, where the claimant incurs loss or expense in the course of taking reasonable steps to mitigate the loss resulting from the defendant's breach the claimants may recover this further loss or expense from the defendant."

21. The first rule makes it clear that the claimant must act reasonably in seeking to mitigate his loss. However, there are two important considerations. First, that the burden on the claimant to show that he has acted reasonably is not that great. Secondly, the defendant bears the burden of showing that he did not act reasonably.

22. Since the Charterers did not challenge the Owners' evidence as to how they employed the vessel after redelivery, I accept that Owners acted reasonable when seeking employment for the vessel. To this extent, the Charterers clearly failed to discharge the burden required of them to show that the Owners acted unreasonably.

23. Therefore, I am, in principle, prepared to accept the Owners' evidence as to damages, except for two discrepancies. First, they claimed damages over 99 days, whereas their itemised damages only spanned a period of 98.01389 days. Secondly, their calculations did not take account of commissions, which should have been deducted from their gross earnings for the full period of damages. I have therefore calculated the Owners' damages as follows:

   Hire due under the Charterparty:

   - 10/10/09 to 16/1/10 = 98.01389 days x
     US$6,000 daily less 5% commission              US$558,679.

Case 1:10-cv-08452-WHP   Document 4-3   Filed 11/11/10   Page 13 of 19

12

- Less hire earned under the substitute charters:

- 28/10/09 to 22/12/09 = 55.01389 days
  x US$6,200 daily less 2.5% commission       - US$332,558
- 22/12/09 to 16/1/10 = 25 days x
  US$5,500 daily less 3.75% commission        - US$132,343

- Damages                                      US$  93,778

24. I have therefore awarded the Owners the sum of US$93,778 by way of proven damages.

   (IV) Damages for detention:

25. The Owners claimed the sum of US$379,761.67, later amended to US$636,000, in respect of damages for detention when the vessel was arrested at Fujairah between 10th May 2010 and 24th August 2010, due to the Charterers' failure to pay a bunker supplier (which had supplied the vessel with bunkers whilst under the Charterers' control). The Owners calculated damages over a period of 106 days at the Charterparty rate of US$6,000 per day.

26. The Owners provided evidence from a firm of Dubai lawyers, Fichte & Co, that on 10th May 2010, the vessel was arrested at Fujairah in respect of a debt of US$192,207.32 relating to Charterers' failure to pay Wire Bunkering Pte, who supplied bunkers to the vessel at Singapore in June 2009. In addition, there was evidence that DS Petro had also attached to the arrest in respect of unpaid bunkers amounting to AED 485,273.18 relating to bunkers supplied to the vessel at Jebel Ali in August 2009.

27. Given the evidence available to me, I am satisfied that (i) the vessel remained under arrest at Fujairah between 10th May and 24th August 2010 and (ii) *prima facie*, that the arrest is due to the fault of the Charterers' failure to pay bunker suppliers in accordance with the terms of the Charterparty. Therefore, since the Charterers have not disputed the Owners' evidence, I accept that the Owners are entitled to damages for detention for the period 10th May to 24th August 2010.

28. Although the Owners claimed damages of US$636,000 for the period 10th May to 24th August 2010, their calculation did not take account of address commission. Whereas, their original claim for US$379,762.67 (which calculated damages to 22nd June 2010) did deduct address commission and C/V/E costs, but included the cost of 172 mt of MDO at US$735 per mt.

29. Since the vessel remains under arrest and damages are on-going, the calculation of damages will doubtless be reviewed in the future. Therefore, for the purposes of this award, I have calculated damages as follows:

| | |
|---|---|
| 106 days x US$6,000 | US$636,000.00 |
| Less | |
| 2.5% address commission | (US$ 15,900.00) |
| C/V/E costs 106 x (US$1,250/30) US$41.67 | (US$ 4,417.02) |
| Plus | |
| Bunkers 172 mt x US$735 | US$126,420.00 |
| Total | US$742,102.98 |

30. I am therefore satisfied that, at 24th August 2010, the Owners are entitled to damages for detention of "at least" US$636,000 (as claimed in their amended claim submission of 25th August 2010).

31. I reserve my jurisdiction to make further award/s in respect of damages for detention.

V) Quantum:

32. I have calculated quantum as follows:

| | |
|---|---|
| The final balance of account | US$   437,795.59 |
| Damages | US$    93,778.00 |
| Detention | US$   636,000.00 |
| Total | US$1,167,573.59 |

33. I have therefore awarded the Owners the sum of US$1,167,573.59 by way of this interim award.

(VI) Interest:

34. I have award interest at commercial rate as follows:

   (i)   on the final balance of account of US$437,795.59 from 9th October 2009, being the date that the vessel was redelivered to the Owners, to the date of payment;

   (ii)  on damages of US$93,778.00 from 16th January 2010, being the earliest date of redelivery under the terms of the Charterparty, to the date of payment; and

   (iii) on damages for detention of US$636,000.00 from 25th August 2010, being the day after damages have been calculated, to the date of payment.

(VII) Costs:

35. In accordance with the normal rule that costs follow the event, the Charterers shall pay the Owners' recoverable costs of this award, together with my costs.

**NOW I**, the said Alan Oakley having taken upon myself the burden of this reference and having carefully and conscientiously considered the submissions and evidence put before me by the parties **DO HEREBY MAKE, ISSUE AND PUBLISH** this my **FIRST/FINAL ARBITRATION AWARD** as follows:

**I FIND AND HOLD** that the Owners' claim succeeds in the sum of US$1,167,573.59 and no more; and

**I THEREFORE AWARD AND DIRECT** that:

A) the Charterers shall forthwith pay to the Owners the sum of US$1,167,573.59 (one million, one hundred and sixty-seven thousand, five hundred and seventy-three United States dollars and fifty-nine cents);

B) the Charterers shall pay interest on the sum US$1,167,573.59 at the rate of 5% per annum compounded at three-monthly rests on the following basis:

   i. on the sum of US$437,795.59 from 9th October 2009, to the date of payment;

    ii. on the sum of US$93,778.00 from 16th January 2010, to the date of payment; and

    iii. on the sum of US$636,000.00 from 25th August 2010, to the date of payment.

C) the Charterers shall bear their own and the Owners' recoverable costs of this award, the latter of which shall, unless agreed, be assessed on the standard basis by the English High Court or, in the Owners' option, by me in an Award on Costs, for which purpose I hereby reserve my jurisdiction;

D) the Charterers shall also bear the costs of this award in the sum of £4,835 provided that if, in the first instance, the Owners shall have paid any amount in respect of such costs, they shall be entitled to an immediate reimbursement of that amount from the Charterers; and

E) the Charterers shall also pay interest on the Owners' costs awarded in paragraph C above and on any sum paid by the Owners in respect of the costs of this award set out in paragraph D above at the rate of 5% per annum compounded at three-monthly rests from the date hereof in the case of the Owners' costs and from the date of payment to me in respect of the costs of this award, in both cases until payment or reimbursement as appropriate of such sum by the Charterers.

**THIS ARBITRATION AWARD** is interim in the reference, however final as to matters decided herein. I reserve my jurisdiction to make further Award(s) in respect of matters not dealt with herein including any further claim in respect of the vessel's detention at Fujairah.

Given under my hand in London this 2nd day of September 2010

*[signatures]*

Alan Oakley                                                                 Witness

18

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

B E T W E E N

Marklink Shipping Co Ltd
Owners/Claimants

and

Bright Shipping Company Limited
and/also known as Bright Ocean Company Limited
Charterers/Respondents

m.v. "ATLANTIC PROJECT"

Charterparty dated 12th February 2009

FIRST/FINAL ARBITRATION AWARD